Alphonso **BURKE**, Plaintiff–Appellant,

v.

**SPARTANICS LTD.**, and its successor corporation, whose name is presently unknown to plaintiff, Defendant–Appellee,

Spartanics Ltd., Defendant–Third–
Party–Plaintiff–Appellee,

v.

Metal Etching Company, Third–
Party–Defendant–Appellee.

Docket No. 00–7145.

United States Court of Appeals,
Second Circuit.

Argued Nov. 22, 2000.

Decided June 4, 2001.

Scott A. Korenbaum, Law Offices of Frederick K. Brewington, Hempstead, NY, Frederick K. Brewington, on the brief, for Plaintiff–Appellant.

Robin Mary Heaney, Law Offices of Vincent D. McNamara, East Norwich, NY (James P. Haggerty, on the brief), for Defendant–Third–Party–Plaintiff–Appellee.

John O. Brennan, Ryan & Brennan LLP, Floral Park, NY, for Third–Party–Defendant–Appellee.

Before CALABRESI and PARKER, Circuit Judges, and TRAGER,* District Judge.

CALABRESI, Circuit Judge:

A metal shearing machine severed the fingers of plaintiff-appellant Alphonso Burke's right hand while he was at work. Burke brought suit in the United States District Court for the Eastern District of New York (Joanna Seybert, *Judge*), invoking the court's diversity jurisdiction. In his suit Burke asserted various New York State tort claims against the machine's manufacturer, defendant-appellee Spartan-

---

* The Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

ics Ltd. ("Spartanics"), which in turn impleaded Burke's employer, Metal Etching Company ("Metal Etching"), as a third-party defendant. The case proceeded to trial on Burke's claims, principally that the machine was defectively designed, and that Spartanics failed to provide adequate warnings of the dangers of using the machine. The jury returned a verdict against plaintiff on all counts. Burke now appeals from the judgment entered pursuant to that verdict and also from the district court's denial of his post-trial motion for judgment as a matter of law or for a new trial. We affirm.

### Background

#### The Accide

The accident occurred while Burke was receiving instruction from a supervisor, Mr. O'Neill, on how to perform a particular job with the machine in question, which cuts sheets of metal with a shear. Believing that O'Neill had finished setting up the job, Burke went to the rear of the machine to clear out some cut pieces of metal. After being cut, the pieces of metal had fallen and accumulated in a ramp mounted behind the machine. As was the usual practice in Metal Etching's shop, in order to gain leverage while removing the metal with his left hand, Burke placed his right hand on the machine's cutting surface. Apparently unaware of what Burke was doing, O'Neill attempted to make a cut and, in doing so, severed Burke's fingers, which were in the cutting plane.

The ramp from which Burke was removing the metal when the accident occurred had been installed by Metal Etching. This ramp altered a feature of the machine as initially delivered by Spartanics. The original machine had another ramp with a conveyor belt that ran across the rear of the machine leading to a stacking bin at the machine's side. Metal Etching installed its own ramp above the conveyor system in order to catch the metal cuttings before they hit the conveyor. It did so allegedly to avoid a totally different hazard that the original ramp would supposedly have created. With the original conveyor system in place, however, there was no need for workers to clear cut material from the rear of the machine. But with the new ramp installed, employees not only had to remove the cut material but found that doing so required bracing themselves with one hand on the cutting surface.

By the time of the accident, Burke had been using the machine for about seven months. He fully understood how it worked, where the cutting plane was, and how dangerous it was to place one's hand in the plane while the machine was in operation. He was also aware of the warning label on the front of the machine that specifically warned against getting near the cutting mechanism. There was no warning label on the rear of the machine.

#### The Evidence On The Machine's Design

Burke contended at trial that Spartanics could have anticipated that some customers would remove the conveyor mechanism and that it, therefore, should have designed the machine with a guard that prevented a worker from getting near the blade when approaching the machine from the rear. (There was such a guard on the front of the machine.) Spartanics responded with expert testimony that such a rear guard would have limited the shapes of metal that could be cut and that, in any event, the conveyor system it provided eliminated any need to approach the cutting plane from the rear. Plaintiff attacked the manufacturer's argument (a) by pointing out that the conveyor system was never identified as a safety device in the machine manuals, (b) by introducing testi-

mony that Spartanics had never attempted to design a rear guard, (c) by showing that Metal Etching had been able to install such a safety device after the accident, and (d) by putting on his own expert who testified that Spartanics could have easily, and cheaply, designed and installed a rear safety device.

*The Evidence of Burke's Drug Use*

Before trial, plaintiff moved *in limine* to exclude any evidence of Burke's use of marijuana and cocaine. At oral argument on this motion, defendant pointed out that plaintiff's psychiatric expert on damages referred in his report to increased drug use in the aftermath of the accident. This, defendant argued, meant that evidence of Burke's pre- and post-accident drug use would be relevant to the magnitude of his damages. The court agreed that if the psychiatrist testified that post-accident drug use was caused by the accident, cross-examination on pre-accident drug use would be appropriate. Plaintiff, however, stated that he did not intend to pursue a damages theory grounded in such post-accident drug use. Based on this stipulation, the court granted the motion to preclude.

Nevertheless, at trial, plaintiff's expert did testify to Burke's increasing post-accident drug use. He gave this testimony in response to an innocuous cross-examination question concerning the number of sessions the expert psychiatrist had conducted with plaintiff. In his answer, the psychiatrist first referred to a period of inpatient treatment arising from Burke's contemplation of suicide, and then he added "And he also had been using-he was involved in the increasing use of marijuana and alcohol." Defense counsel immediate-

ly followed up with several more questions concerning alcohol and drug use. When plaintiff's counsel finally objected, the district court ruled that such inquiries were "appropriate because he indicated that that's part of his damages now." Judge Seybert instructed the jury, both after the testimony and before deliberations, that it could consider the testimony on alcohol and drug use only with respect to its evaluation of damages.

*The Instruction on Duty to Warn*

At the charging conference, plaintiff's counsel requested that the court's instructions on the manufacturer's duty to warn include the statement that "even if Mr. Burke was aware of a danger, that did not obviate the need of Spartanics to warn." Judge Seybert rejected this proposal, and, instead, instructed the jury that "[i]f you find that Alphonso Burke already knew of the danger or dangers associated with the Spartanics WL–2 metal shearing machine, you will find that the defendant had no duty to warn him of the dangers associated with the machine."

*The Post–Trial Motions*

After the jury returned its verdict finding for defendants on August 3, 1999, Burke moved for judgment as a matter of law. The district court reserved decision, received written motion papers several weeks later, and subsequently denied the motion on January 20, 2000. Burke now appeals from the judgment, entered immediately after trial, pursuant to the jury verdict and from the district court's disposition of his post-trial motion, which had raised issues similar to those now presented on appeal.[2]

---

**2.** Because Burke made an oral Federal Rule of Civil Procedure 50(b) motion at the close of trial, his time to appeal the judgment against him did not begin to run until Judge Seybert

decided that motion. *See* Fed.R.App.P. 4(a)(4)(A); *Meriwether v. Coughlin,* 879 F.2d 1037, 1040–42 (2d Cir.1989) (holding that a Rule 50(b) motion was timely when made

*Discussion*

Burke argues (1) that the evidence at trial warranted judgment in his favor as a matter of law, (2) that the district court should not have permitted testimony concerning his past drug use, and (3) that the court incorrectly instructed the jury on the standard governing Spartanics' duty to warn. The first two contentions require little discussion. The third has some merit, but, nevertheless, does not justify a new trial.

## A. Judgment as a Matter of Law

■ With regard to whether plaintiff was entitled to judgment as a matter of law on his claim that the shearing machine was defectively designed insofar as it lacked a rear safety guard, Burke has failed to meet the heavy burden placed on a party seeking to upset a jury verdict. "[J]udgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998) (internal quotation marks and brackets omitted). Given the conflicting evidence concerning (a) the safety of the machine as manufactured and (b) the difficulty of installing a rear guard without incurring undue costs or limitations on the machine's functionality, the jury could reasonably have concluded that the machine at issue was not defectively designed. *See generally Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d

730 (1995) (discussing New York's standards for finding design defects).

## B. The Evidence of Drug Use

■ Burke's second argument—that evidence of his drug use was improperly admitted-is also easily disposed of. In light of the testimony by plaintiff's expert that Burke's post-accident hospitalization was due in part to "increasing use of marijuana and alcohol" (testimony that was not directly elicited by defense counsel and that was contrary to plaintiff's prior stipulation that he would not include increased drug use as a component of his damages), the district court did not abuse its discretion in allowing subsequent questioning about the extent of Burke's drug and alcohol use before and after the accident. *Cf. Fletcher v. City of New York*, 54 F.Supp.2d 328, 333–34 (S.D.N.Y.1999) (admitting evidence of plaintiff's past drug use for the limited purpose of proving that plaintiff's injuries were caused by past drug use, not by defendants' conduct) (following *Lewis v. District of Columbia*, 793 F.2d 361, 363 (D.C.Cir.1986)).

■ Although such evidence obviously poses a danger of unfair prejudice to plaintiff, the district court took reasonable steps to minimize that danger by twice instructing the jury on the limited purpose for which it could consider the evidence. *See United States. v. Salameh*, 152 F.3d 88, 116 (2d Cir.1998) (*per curiam* ) ("Juries are presumed to follow their instructions." (quoting *Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993))). Under these circumstances, the trial judge was within her discretion in allowing the testimony as evidence relevant to Burke's damages.

orally in open court at the close of trial, and notwithstanding the fact that no motion pa-

pers were filed until more than 10 days after judgment was entered).

## C. The Instruction on Spartanics' Duty to Warn

At trial, Burke objected to the district court's instruction to the jury that, if it found that "[1] Burke already knew of the danger or dangers associated with the Spartanics metal shearing machine, or [2] that the dangers associated with the machine were obvious, and generally known and recognized, you will find that the defendant Spartanics had no duty to warn Mr. Burke of the dangers associated with the metal shearing machine." Based on Burke's own requested instruction, his statements to the trial judge, and his briefing on appeal, we discern two discrete arguments put forward by appellant: first, that the court below erred in instructing the jury that Spartanics had no duty to warn of risks that were "obvious"; second, that the court erred in instructing the jury that Spartanics had no duty to warn of risks about which Burke himself was aware. For both propositions appellant relies on our recent decision in *Liriano v. Hobart Corp.,* 170 F.3d 264, 269 (2d Cir. 1999) ("*Liriano III* "), in which we applied New York's failure-to-warn law as set forth by the New York Court of Appeals in *Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 677 N.Y.S.2d 764, 700 N.E.2d 303, 308 (1998) ("*Liriano II*"), *answering questions certified by Liriano v. Hobart Corp.,* 132 F.3d 124 (2d Cir.1998) ("*Liriano I* ").

■ The first of these arguments is plainly wrong. It is a well-established principle of New York law that "a limited class of hazards need not be warned of as a matter of law because they are patently dangerous or pose open and obvious risks." *Liriano II,* 92 N.Y.2d 232, 677 N.Y.S.2d 764, 700 N.E.2d 303, 308; *accord, e.g., Bazerman v. Gardall Safe Corp.,* 203 A.D.2d 56, 609 N.Y.S.2d 610, 611 (1st Dep't 1994). This is just another way of saying that a reasonable person would not warn of obvious dangers, *i.e.* those harms that most all people know about. As a result, as to these risks, it cannot be negligent to fail to warn.

Not only did the New York Court of Appeals in *Liriano II* reaffirm the "obviousness" exception to a manufacturer's duty to warn, *see Lauber v. Sears, Roebuck and Co.,* 273 A.D.2d 922, 709 N.Y.S.2d 325, 326 (4th Dep't 2000); *Brady v. Dunlop Tire Corp.,* 275 A.D.2d 503, 711 N.Y.S.2d 633, 634–35 (3d Dep't 2000), but nothing in our opinion in *Liriano III* suggests the contrary. The question in *Liriano III* was simply "obviousness of what?" The *Liriano* cases involved an employee who injured his hand in the course of using a meat grinder that was manufactured with a safety guard but from which the guard had been removed. In *Liriano III* we upheld the verdict for the plaintiff because the jury could have found that, absent an appropriate warning, it was not obvious "(a) that it is feasible to reduce the risk with safety guards, (b) that such guards are made available with the grinders, and (c) that the grinders should be used only with the guards." *Liriano III,* 170 F.3d at 271. Because the *existence of a safer method* of using the grinder was not obvious, a jury could have found that a duty to warn, *i.e.* to inform the plaintiff that the machine should not be used in the absence of that safer method, was violated. Accordingly, it was unnecessary in *Liriano III* to decide whether it was obvious that the method plaintiff actually used was dangerous. *See id.*

■ At oral argument, Burke made clear that his contention is that Spartanics should have placed a warning, at the rear approach to the machine, about the dangers of placing one's hand in the cutting plane. His argument was *expressly not* that Spartanics should have warned that the (perhaps obvious) dangers associated

with access to the machine from the back could be obviated by use of the original conveyor system, and that the machine should not be used without that conveyor system. Nor was this latter argument, an analogue to that upheld in *Liriano III*, put forward below. Accordingly, *Liriano III* is of no benefit to plaintiff, and the trial court was correct in charging the jury that there was no duty to warn if "the dangers associated with the machine were obvious, and generally known and recognized."

Burke's second argument—that *his own* knowledge of the machine's dangerousness did not negate Spartanics' duty to warn— is essentially correct, but for reasons that do not ultimately undermine our confidence in the jury verdict. The problem with the court's instruction lies in its conflation of two separate issues: (1) whether the manufacturer, considering the reasonably foreseeable uses to which its product might be put, had a duty to warn potential users in general about the machine's dangers; and (2) whether, in retrospect, giving a warning would have made any difference *to this particular plaintiff.* The first question concerns the "open and obvious risks" exception, which goes to the manufacturer's *duty.* The second question, in contrast, goes to the analytically distinct issue of whether a putative breach of that duty was a *cause* of this plaintiff's injury.

▇ Whether a given risk is "obvious" depends in large part on what the mass of users knows and understands. Thus, "[a] manufacturer has a duty to warn against latent dangers resulting from *foreseeable uses* of its product of which it knew or should have known." *Liriano II*, 677

N.Y.S.2d 764, 700 N.E.2d at 305 (emphasis added). Accordingly, "courts treat obvious danger as 'a condition that would ordinarily be seen and the danger of which would ordinarily be appreciated by *those who would be expected to use the product.*'" *Id.* at 308 (quoting Prosser and Keeton, *Torts* § 96, at 686–87 (5th ed.1984)) (emphasis added).

The class of reasonably foreseeable users will, of course, encompass a spectrum of persons with widely varying abilities and experience bearing on their perception of the hazards at hand. Some may be practiced and skilled operators, while others may be novices, or may use the machine in adverse conditions that, though atypical, are still foreseeable. *See id.* at 305 ("A manufacturer also has a duty to warn of the danger of unintended uses of a product provided these uses are reasonably foreseeable."); *id.* at 307 (duty to warn of dangers arising from foreseeable alterations to a product).

▇ So long as the relevant risks are not obvious to *some* members of the class of foreseeable users, a reasonable manufacturer might well be expected to warn. And, as a result, a duty to warn will generally be said to exist.[3] *See id.* at 308 (the purpose of the "open and obvious" exception is to identify "dangers of which a user might not otherwise be aware," thereby enabling "consumers to adjust their behavior"). This is so, moreover, notwithstanding the fact that there may also be foreseeable users for whom the warning is superfluous. It is always possible that a particular plaintiff has a greater awareness of the risks in question than do other

---

**3.** That duty will, of course, only be violated if the utility of the warning is not outweighed by the costs of providing it. *See Liriano II*, 677 N.Y.S.2d 764, 700 N.E.2d at 307; *Liriano III*, 170 F.3d. at 271. But this is usually a jury question. *Havas v. Victory Paper Stock Co.,* 49 N.Y.2d 381, 426 N.Y.S.2d 233, 402 N.E.2d 1136, 1139–40 (1980) (noting that it is generally appropriate for juries to make "the determination of issues revolving about the reasonableness of conduct").

users who are or ought to be foreseeable to the manufacturer, and it is, therefore, error to instruct the jury, as was done here, that there is no duty to warn simply because *the particular plaintiff* was cognizant of the relevant hazards.[4]

■ But of course a defendant's *liability* will not arise from a breach of duty alone. Instead, the plaintiff must show, in addition, that "the failure to warn [was] a substantial cause of the events which produced the injury." *Billsborrow v. Dow Chem.*, 177 A.D.2d 7, 579 N.Y.S.2d 728, 733 (2d Dep't 1992). And "where the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of the safety device whose purpose is obvious, lack of a warning about that danger may well obviate the failure to warn as a legal cause of an injury resulting from that danger." *Liriano II*, 677 N.Y.S.2d 764, 700 N.E.2d at 308; *accord Smith v. Stark*, 67 N.Y.2d 693, 499 N.Y.S.2d 922, 490 N.E.2d 841, 842 (1986). Thus, it may well be the case that a given risk is not "obvious," in the sense of precluding any duty to warn, but that nevertheless, because the risk was well understood by the plaintiff, a warning would have made no difference. *See Brady*, 711 N.Y.S.2d at 634–36 (distinguishing issue of whether risk was "open and obvious" from issue of whether plaintiff had "actual knowledge of the hazard"). And the failure to warn was therefore not a cause of the harm.

There are sufficient similarities between the issues of (a) whether a hazard was sufficiently obvious to all *foreseeable users* to preclude any *duty to warn*, and (b) whether the danger was sufficiently well known to *the plaintiff* to preclude a showing of *causation*, that confusion between them is not surprising. This is especially so because the concrete experiences of individual plaintiffs understandably, and properly, provide an important reference point in assessing the range of knowledge among reasonably foreseeable users. *See Liriano III*, 170 F.3d at 268–69. Nonetheless, recognizing the difference between these questions is important.

If the distinction is not observed, manufacturers' duties may be diluted by cases in which the particular plaintiff happens to have had a greater appreciation of the risks than would the mass of other foreseeable users. Where such greater individual awareness of the risk means that a warning would not have prevented the injury, failure to distinguish *duty* from *cause* may lead to an (erroneous) finding of no duty to warn notwithstanding the fact that foreseeable users would in fact be significantly aided by a warning. And, as a result of such a holding, subsequent plaintiffs injured by the same instrumentality would be faced with a prior ruling establishing the absence of any duty to warn, even though their appreciation of the risk might well be low enough to establish causation. Conversely, the distinction protects manufacturers against suits by plaintiffs who, though sufficiently ignorant that a warning would have enabled them to avoid an accident, were so unforeseeable that the manufacturer had no duty to pro-

---

4. In assessing the manufacturer's duty, we ask, essentially, what it ought to have done when distributing its product (or upon receiving new information about its dangers, *see Liriano II*, 677 N.Y.S.2d 764, 700 N.E.2d at 307), a question that necessarily arises *before* the particular accident forming the basis for litigation. The content of this duty, therefore, cannot vary depending on who, among foreseeable users, ultimately happens to be injured by the product. *Cf. id.* at 306 (noting that, with respect to the manufacturer's responsibility for design defects, "this duty is not open-ended, and it is measured as of the time the product leaves the manufacturer's premises").

vide them with notice of what to foreseeable users would be obvious. *Cf. Liriano II*, 677 N.Y.S.2d 764, 700 N.E.2d at 308 (noting that requiring warnings against obvious dangers would tend to "trivialize[ ] and undermine[ ] the entire purpose of the rule [by] drowning out cautions against latent dangers").

*Harmless Error*

■ The same fact—Burke's awareness of the risk of placing his hand in the cutting plane while removing metal from the ramp—that appellant urges (correctly) should not have been permitted to negate Spartanics' duty to warn *does*, however, fully negate any causal connection between the absence of a rear warning and his injuries. *See, e.g., Smith*, 499 N.Y.S.2d 922, 490 N.E.2d at 842 (finding no causation because plaintiff must have known based on his "general knowledge of pools, his observations prior to the accident, and plain common sense . . . that, if he dove into the pool, the area into which he dove contained shallow water"); *McMurry v. Inmont Corp.*, 264 A.D.2d 470, 694 N.Y.S.2d 157, 158–59 (2d Dep't 1999) (holding that, given plaintiff's experience and training, "a warning would not have added anything to the appreciation of this hazard"). The erroneous instruction was therefore harmless. *See Renz v. Grey Adver., Inc.*, 135 F.3d 217, 224 (2d Cir.1997) (holding that an erroneous charge was harmless because the "evidence [against plaintiff] is so strong that a correct charge on the plaintiff's standard of proof . . . would not have made a difference to the verdict").

In reaching this conclusion, we are cognizant that the essence of Burke's claim is that a warning on the rear of the machine would have *reminded* him of the danger of placing his hand near the cutting mechanism, not simply that a warning would have *informed* him of that danger. Warnings, of course, can serve to bring dangerous conditions to a user's attention, not merely to explain that they are dangerous. Thus, the mere fact that Burke already knew that it was dangerous to put his hand in the cutting plane (in the sense that, had he been asked whether it was dangerous, he would have answered that it was and would have understood why), is compatible with the notion that, had he seen a warning at the time he was choosing to put his hand there, such a warning might have prompted him to exercise greater care (whether by finding another source of leverage or by making sure that O'Neill knew not to engage the blade). *Cf. Liriano II*, 677 N.Y.S.2d 764, 700 N.E.2d at 308 (noting that ultimate measure of need for warnings is whether they aid or hinder customers in adjusting their behavior to avoid accidents).

Nonetheless, on the facts presented here, we have no doubt that the lack of a warning on the rear of the machine was not a cause-in-fact of the accident. This is not a case in which a usually careful employee uncharacteristically forgot to take a safety precaution, nor one in which a plaintiff, though fully apprised of a machine's dangers, simply forgot to take care in the course of using the machine for the first time, or after a long hiatus. In such circumstances, it might be the case that a reminder could avert an accident.[5]

5. The causation analysis focuses on Burke's "actual knowledge of the specific hazard that caused the injury," *Liriano II*, 677 N.Y.S.2d 764, 700 N.E.2d at 308; *Brady*, 711 N.Y.S.2d at 635, not the knowledge Burke *should have* possessed. As the district court instructed the

jury below, even if a warning would, in fact, have prompted Burke to avoid the accident, the jury might still have found that under New York's rules of comparative fault he bore some share of responsibility for not recognizing and avoiding the hazard without the bene-

Here, instead, the method by which plaintiff removed cut metal from the ramp (*i.e.*, by bracing himself with one hand on the machine's cutting surface) was the routine manner in which this task was carried out at Metal Etching. Indeed, plaintiff testified that he had been trained to act in this way, that his supervisor acted in this way, and that he had never been instructed by his employer to clear out the machine in any other manner. Burke also testified that putting his hand near the blade "caused [him] concern" but that he never complained because he did not want to cause trouble, because it was the only way to accomplish the task, and because it was understood that, precisely to mitigate the maneuver's well-known dangers, one did not operate the machine while someone else was behind it retrieving materials.

 If we assume—as we must—that the jury, based on the incorrect instruction, found that these facts concerning Burke's awareness of the machine's dangers precluded any duty on defendant to provide a rear warning, then we must also say, as a matter of law, that the same jury, properly instructed, would have found that Burke was sufficiently aware of the danger to preclude the required causal connection between the absence of a warning and the accident in question. In circumstances such as these, an erroneous instruction is harmless. *See United States. v. Malpeso,* 115 F.3d 155, 165–67 (2d Cir.1997) (upholding conviction where, assuming that the jury was erroneously instructed that certain facts would support liability on one theory, the same facts would impose liability on another theory that also was before the jury).

fit of a warning. *See generally Arbegast v. Bd. of Educ. of S. New Berlin Cent. Sch.,* 65 N.Y.2d 161, 490 N.Y.S.2d 751, 480 N.E.2d

*Conclusion*

We hold (1) that plaintiff was not entitled to judgment as a matter of law on his claim that the machine was defectively designed, (2) that admitting evidence of his drug use was not an abuse of discretion, and (3) that the jury charge on defendant's duty to warn, though in part erroneous, was harmless. Accordingly, and having considered and rejected all of appellant's other arguments, we AFFIRM.

365 (1985) (describing New York's system of "comparative causation").